## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THOMAS KEETON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 15-1036-LPS |
| | ) | |
| BOARD OF EDUCATION OF SUSSEX | ) | |
| TECHNICAL SCHOOL DISTRICT, | ) | |
| TERRI L. CORDER, in her individual and | ) | |
| official capacity as Principal of Sussex | ) | |
| Technical Adult Division, James H. Groves | ) | |
| High School, and DR. MICHAEL OWENS, | ) | |
| in his individual and official capacity as | ) | |
| Director of Extended Learning of Sussex | ) | |
| Technical Adult Division, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

In this action filed pursuant to 42 U.S.C. § 1983 ("Section 1983"), Plaintiff Thomas Keeton ("Plaintiff") has sued Defendant Board of Education of the Sussex Technical School District ("Board"), Defendant Terri L. Corder ("Defendant Corder"), individually and in her official capacity, and Defendant Dr. Michael Owens ("Defendant Owens"), individually and in his official capacity (collectively, "Defendants"). Presently pending before the Court is Defendants' "Motion to Dismiss Plaintiff's Second Amended Complaint[,]" filed pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Motion"). (D.I. 30) For the reasons that follow, the Court recommends that Defendant's Motion be GRANTED-IN-PART and DENIED-IN-PART, as is further set out below.

## I.      BACKGROUND

### A.      The Parties

Plaintiff is a resident of Maryland. (D.I. 33 at ¶ 3)  Until his termination in 2015, he was a teacher and part-time coordinator for the Sussex Technical Adult Division. (*Id.* at ¶¶ 3, 22)

The Board is a reorganized school board operating under 14 Del. C. § 1043. (*Id.* at ¶ 6) It is the governing body of the Sussex Technical School District, a political subdivision. (*Id.*) Defendant Corder is the Principal of Sussex Technical Adult Division, and she has served in this position at all times relevant to the operative complaint here, which is the Second Amended Complaint ("SAC"). (*Id.* at ¶ 4)  Defendant Owens is the Director of Extended Learning of Sussex Technical Adult Division. (*Id.* at ¶ 5)

**B.    Factual Background**

Plaintiff began working as a teacher for the Sussex Technical Adult Division beginning in 2003, and he served as a part-time coordinator from 2011 until his the expiration of his contract on June 30, 2015. (D.I. 33 at ¶¶ 3, 22)  As a teacher, he provided basic math and English instruction to certain students, which prepared the students for an assessment test. (*Id.* at ¶ 7)  As a coordinator, his duties included developing systems to report absences and site activity levels, managing computer technology systems, converting Adult Education documents to PDF forms, preparing said documents for web posting, and developing a teacher evaluation system. (*Id.* at ¶ 8)  He carried out several other "general" job duties that are set out in the SAC (e.g., taking photographs at graduation ceremonies, or serving as a substitute technology instructor), but he had no involvement with the selection of books or materials for Sussex Technical School District curricula. (*Id.* at ¶¶ 9-10)  Rather, Kelly Whaley was the school employee "responsible for all the curriculum items which included the selection of books and materials." (*Id.* at ¶ 12)

During Plaintiff's employment with Sussex Technical School District, Plaintiff alleges

that Defendant Corder regularly made decisions about hiring, firing, and failing to renew contracts of employees; during that time, for example, Defendant Corder fired four school district employees. (*Id.* at ¶¶ 25, 27)  Plaintiff made recommendations to Defendant Corder on personnel matters (such as whether to hire part-time employees), and Defendant Corder "acted on [these personnel decisions] herself, without Board of Education involvement[.]" (*Id.* at ¶ 26)

Plaintiff also alleges that for many years, he was aware that Defendant Corder had been copying and/or approving the copying of textbooks, but that Defendant Corder had told him that she had permission to do so. (*Id.* at ¶¶ 14, 17)  On May 26, 2015, shortly after becoming aware that Defendant Corder did not, in fact, have permission to copy textbooks, Plaintiff presented to Defendant Corder a list of copyright infringements "totaling almost half a million dollars that Sussex Technical Adult Division had been and was engaging in[.]" (*Id.* at ¶¶ 13, 16)  Plaintiff proceeded to tell Defendant Corder that the illegal copyright infringement she had sanctioned "was wrong, illegal, had to stop, but also had to be rectified so as to make Sussex Technical School District in compliance with the law." (*Id.* at ¶ 18)

Less than three weeks later, on June 12, 2015, Defendant Corder told Defendant Owens about the statements Plaintiff had made. (*Id.* at ¶ 20)  On or about the week of June 22, 2015, Defendant Corder recommended to Defendant Owens that Plaintiff's contract not be renewed. (*Id.* at ¶ 21)  The following week, on June 29, 2015, Defendant Corder called Plaintiff and advised him of the decision not to renew his contract. (*Id.* at ¶ 23)  Defendant Corder also sent Plaintiff a letter dated June 29, 2015 stating: "'I will not be able to offer you a part time position within the Adult Division for the summer or the coming school year.'" (*Id.* at ¶ 24)  Defendant Corder provided no explanation for Plaintiff's termination, or for the failure to renew his

3

contract, despite Plaintiff's "many years of exemplary service." (*Id.* at ¶ 42)

## C.   Procedural Background

On November 10, 2015, Plaintiff filed a Complaint in this Court pursuant to Section

1983, naming the Board and Defendant Corder as Defendants and alleging retaliation in violation

of the Free Speech Clause and Petition Clause of the First Amendment, as well as a violation of

the Fourteenth Amendment. (D.I. 1 at ¶¶ 44-54)  On December 4, 2015, Defendants filed a

motion to dismiss the Complaint. (D.I. 8)  That motion was subsequently mooted by Plaintiff's

filing of the First Amended Complaint ("FAC") on December 10, 2015. (D.I. 10)  The FAC

alleged the same First Amendment claims that were set out in the original Complaint, as well as a

violation of the implied covenant of good faith and fair dealing under Delaware law; the FAC did

not allege a violation of the Fourteenth Amendment. (*Id.*)

Defendants filed a motion to dismiss the FAC on December 21, 2015. (D.I. 11)  On

January 29, 2016, Chief Judge Leonard P. Stark referred this case to the Court to hear and resolve

all pretrial matters, up to and including the resolution of case-dispositive motions.  Briefing was

completed on the First Motion to Dismiss soon thereafter, on February 16, 2016. (D.I. 14)

On September 27, 2016, Plaintiff filed the SAC,[1] which retains the First Amendment

claims but no longer includes the Delaware state law claim alleging a violation of the implied

covenant of good faith and fair dealing. (D.I. 27)  The SAC also added Defendant Owens as a

defendant, alleging that both he and Defendant Corder (together, the "Individual Defendants")

took action adverse against Plaintiff in violation of his First Amendment rights. (*Id.* at ¶¶ 63, 66)

---

[1]      An updated version of the SAC, which contained cosmetic revisions, was filed on
October 6, 2016. (D.I. 33)  The Court cites to this document when referring to the SAC in this
Report and Recommendation.

Defendants filed the instant Motion on September 28, 2016, in which they argued that the

SAC should be dismissed "for the [same] reasons" that they had sought dismissal of the FAC.

(D.I. 30 at 2-4)  Defendants and Plaintiff filed short supplemental briefs regarding the instant

Motion, in which they included a small amount of additional argument.  (D.I. 30; D.I. 32)

Moreover, because of the substantial similarities between the FAC and the SAC (and the

similarities between Defendants' arguments seeking dismissal of those respective complaints),

Defendants and Plaintiff both requested that the Court, in deciding the instant Motion, also take

into account the content of their briefing regarding Defendants' motion to dismiss the FAC.  (D.I.

30 at 2; D.I. 32 at 1)[2]

## II.    STANDARD OF REVIEW

Pursuant to Rule 12(b)(6), a party may move to dismiss the plaintiff's complaint based on

the failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).  The

sufficiency of pleadings for non-fraud cases is governed by Federal Rule of Civil Procedure 8,

which requires "a short and plain statement of the claim showing that the pleader is entitled to

relief[.]" Fed. R. Civ. P. 8(a)(2).

When presented with a Rule 12(b)(6) motion to dismiss for failure to state a claim, a

court conducts a two-part analysis. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir.

2009).  First, the court separates the factual and legal elements of a claim, accepting "all of the

complaint's well-pleaded facts as true, but [disregarding] any legal conclusions." *Id.* at 210-11.

Second, the court determines "whether the facts alleged in the complaint are sufficient to show

---

[2]      For this reason, in providing its decision below, the Court will largely cite to the
briefing regarding Defendants' motion to dismiss the FAC.

that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). In assessing the plausibility of a claim, the court must "'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Fowler*, 578 F.3d at 210 (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).

## III.   DISCUSSION

In support of the instant Motion, Defendants argue that Plaintiff's First Amendment retaliation claims should be dismissed because he did not engage in protected speech. (D.I. 12 at 6-10; D.I. 14 at 2-3)  In addition, Defendants claim that neither the Board nor the Individual Defendants in their official capacities can be liable under Section 1983, as the Individual Defendants' alleged actions were not pursuant to official municipal policy, custom, or practice, and they were not ratified by the Board. (D.I. 12 at 4-6; D.I. 14 at 2; D.I. 30 at 2-3)  Furthermore, Defendants argue that Plaintiff's claims against Defendant Corder and Defendant Owens in their individual capacities must be dismissed under the doctrine of qualified immunity. (D.I. 12 at 11-12; D.I. 14 at 4; D.I. 30 at 3-4)  Finally, Defendants assert that Plaintiff has not overcome the burden necessary to recover punitive damages against Defendant Corder in her individual capacity. (D.I. 12 at 3-4; D.I. 14 at 1-2)  The Court will address each of these issues in turn.

### A.   First Amendment Retaliation Claims

6

Count I of the SAC alleges that Defendants "took action adverse to plaintiff as a direct and proximate result of and in retaliation for plaintiff's First Amendment protected speech on matters of public concern." (D.I. 33 at ¶ 63)  Count II alleges that the adverse action also constituted "retaliation for his exercise of [his] First Amendment right to petition the government for redress of grievances." (*Id.* at ¶ 66)  The Court will address the Free Speech Clause and Petition Clause claims together, as the analysis for both claims is identical. *See Morgan v. Covington Twp.*, 563 F. App'x 896, 900 (3d Cir. 2014).  In that regard, analysis of a public employee's claims of First Amendment retaliation follows a three-step test:

> First, the employee must show that the activity is in fact protected. . . .  Second, the employee must show that the protected activity was a substantial factor in the alleged retaliatory action. . . . Third, the employer may defeat the employee's claim by demonstrating that the same adverse action would have taken place in the absence of the protected conduct.

*Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (internal quotation marks and citations omitted).

"The threshold requirement is that the plaintiff identify the protected activity that allegedly spurred the retaliation." *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 282 (3d Cir. 2004).  Here, the SAC clearly asserts that Plaintiff's informing Defendant Corder of the allegedly illegal copyright infringement, and Plaintiff's urging that such activity must stop and be rectified, amounts to the First Amendment-protected activity at issue. (*See, e.g.*, D.I. 33 at ¶¶ 18, 39)  The Court will thus go on to analyze Plaintiff's allegations pursuant to the three-part test set out above.

### 1.    Whether Plaintiff's Speech Was Protected

Whether Plaintiff's speech is protected by the First Amendment is a question of law. *See, e.g., Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 466 (3d Cir. 2015). The United States Court of Appeals for the Third Circuit, citing to the Supreme Court of the United States' decision in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), has explained that a public employee's statement is protected by the First Amendment when: "(1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he made." *Hill v. Borough of Kutztown*, 455 F.3d 225, 241-42 (3d Cir. 2006) (quoting *Garcetti*, 547 U.S. at 418).

Here, Defendants challenge (1) whether Plaintiff has adequately alleged that he spoke as a citizen when making the complaints at issue; and (2) whether Plaintiff has adequately pleaded that his statements involved a matter of public concern. The Court will take up these challenges in order.

### a.   Speaking as a citizen

In *Garcetti*, a 2006 decision, the Supreme Court provided important guidance in helping lower courts determine whether a public employee speaks at a citizen. The *Garcetti* Court explained that "[w]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421.

In a series of cases thereafter, the Third Circuit considered whether a public employee's complaints to a supervisor amounted to citizen speech protected by the First Amendment. In those cases, the Third Circuit consistently held that "complaints up the chain of command about

issues related to an employee's workplace duties—for example, possible safety issues or misconduct by other employees—are within an employee's official duties." *Morris v. Philadelphia Hous. Auth.*, 487 F. App'x 37, 39 (3d Cir. 2012) (citing *Foraker v. Chaffinch*, 501 F.3d 231, 240 (3d Cir. 2007), *abrogated on other grounds by Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011); *Borough of Kutztown*, 455 F.3d at 242). A closer look at those cases shows that they drew a fairly clear line about what type of public employee "complaints up the chain of command" were protected by the First Amendment, and what were not.

In *Hill v. Borough of Kutztown*, 455 F.3d 225 (3d Cir. 2006), for example, the plaintiff was a former borough manager who brought, *inter alia*, Section 1983 claims for retaliation in violation of the First Amendment against the borough and the former mayor of the borough. 455 F.3d at 230-33. In his complaint, the plaintiff alleged that he had received complaints from borough employees about the mayor's harassing actions, and that he had reported those complaints (as well as his own complaints on the same score) to the Borough Council. *Id.* at 242. The Third Circuit, however, found that the plaintiff was not speaking as a citizen when he reported these complaints. *Id.*[3] But crucially, in *Borough of Kutztown*, the plaintiff himself (both in his complaint and in his briefing) described how his reporting of these complaints was "part of his duties as [borough] Manager" and said that he advanced the complaints "in fulfillment of his responsibilities as manager and appointed enforcer of the Borough's Affirmative Action/Equal Employment Opportunity Policy and Program." *Id.* (internal quotation marks, citations and

---

[3]     As to other aspects of the plaintiff's speech—which included "advocating and supporting ideas, principles, and projects that [the mayor] disfavored," the Third Circuit reversed the district court's dismissal and remanded, finding that it could not conclude from the record that the speech was unprotected. *Borough of Kutztown*, 455 F.3d at 242-243, 248.

emphasis omitted).

The Third Circuit again examined the question of citizen speech in *Foraker v. Chaffinch*, 501 F.3d 231 (3d Cir. 2007), a case involving three former Delaware State Troopers who had served as instructors in the Delaware State Police ("DSP") Firearms Training Unit. 501 F.3d at 233. The three troopers were concerned about health and safety issues at the indoor firing range where they were assigned to work. *Id.* The troopers later spoke out about these issues by sending "a number of e-mails regarding the deteriorating conditions at the range to [their] superiors," as well as making similar reports to a State Auditor following the closing of the range; the troopers' attorney later read their statements verbatim to a local newspaper. *Id.* Because the troopers were not permitted to speak to the newspaper without prior approval by their superiors, the DSP brought a disciplinary action against them. *Id.* at 234. This, in turn, prompted the troopers' suit, in which they alleged that they were victims of retaliation for their protected speech about the hazardous conditions at the FTU. *Id.* at 233, 238.

The Third Circuit ultimately found that the *Foraker* plaintiffs "were speaking pursuant to their employment duties when they made their concerns known through the chain of command and when they spoke with the State Auditor[,]" such that their First Amendment claims were foreclosed. *Id.* at 247. The *Foraker* Court's decision, however, was motivated by its findings that: (1) "[r]eporting problems at the firing range was among the tasks that [the troopers] were paid to perform[,]" (2) the troopers' positions "required them to report up the chain of command" and (3) that "their positions as instructors who regularly used and performed light maintenance on the equipment at the range on a daily basis put any environmental concerns there within the scope of their routine operations." *Id.* at 241-42. And though giving statements to the State

Auditor was not part of the troopers' everyday job duties, those statements were *prompted* by the troopers' prior job-related complaints; thus, "[b]ecause the speech that motivated the order [to speak with the State Auditor] was within their job duties, the responsibility to respond to the subsequent order [to speak to the Auditor] was also within the scope of their duties." *Id.* at 243; *see also Dougherty v. Sch. Dist. of Philadelphia*, 772 F.3d 979, 988 (3d Cir. 2014) (distinguishing the statements by the *Foraker* plaintiffs as those "made within their official duties[,] since they were *obligated* to report that type of information up the chain of command") (emphasis added).

Lastly, in *Morris v. Philadelphia Housing Authority*, 487 F. App'x 37 (3d Cir. 2012), the plaintiff was the Executive Assistant to the Executive Director of the Philadelphia Housing Authority ("PHA"). 487 F. App'x at 38. "His duties included the supervision and oversight of various troubled departments at PHA[.]" *Id.* (internal quotation marks and citation omitted). The plaintiff was eventually demoted and his pay was cut after he resisted participation in lobbying activities on behalf of PHA, objected to a lawsuit that PHA filed, raised concerns about the governance of a non-profit organization affiliated with PHA, and claimed that PHA authorities were embezzling money from the nonprofit. *Id.* He then proceeded to file a Section 1983 action against PHA, the nonprofit, and his supervisors and colleagues, alleging retaliation against him for protected speech. *Id.* However, the Third Circuit ultimately categorized the plaintiff's complaints as being made "up the chain of command" and being "about issues related to [his] workplace duties[,]" such that they were not protected under the First Amendment. *Id.* at 39. Important to this conclusion was the fact that the plaintiff "acknowledged that his job duties included the supervision and oversight of various troubled departments at PHA[,]" such as "the

oversight of [the non-profit], and rooting out of financial, as well as other, problems at PHA." *Id.* at 40 (internal quotation marks and citations omitted). Therefore, since the plaintiff "complained to his superiors within PHA about matters arising in the scope of his employment duties, his speech did not have a 'relevant analogue to speech by citizens who are not government employees.'" *Id.* at 40 (quoting *Garcetti*, 547 U.S. at 424).

Thus, in cases like *Borough of Kutztown*, *Foraker* and *Morris*, when determining that the speech at issue did not amount to a plaintiff speaking "as a citizen," it was important not only that the complaints of misconduct were made up the chain of command to the plaintiffs' supervisor, but also that responsibility for communicating the speech at issue *was itself a part of the plaintiffs' typical workplace duties*. In that type of scenario, the speech is said to deal with "management disputes between the government and its employees" and not with constitutionally protected conduct. *Morris*, 487 F. App'x at 40.[4]

----

[4]     Other cases from this Circuit, in which a court has found a plaintiff to have been speaking as a citizen, drew the same distinctions as did the courts in *Borough of Kutztown*, *Foraker* and *Morris*. Representative is the Third Circuit's decision in *DeLuzio v. Monroe County*, 271 F. App'x 193 (3d Cir. 2008). There, the plaintiff alleged that the defendant agency failed to promote him and then terminated him in retaliation for sending numerous memos to his superiors; these memos criticized the agency's provision of services and its internal policies and procedures. *DeLuzio*, 271 F. App'x at 194-95. The Third Circuit, in resolving cross appeals after a trial, found that "[plaintiff] DeLuzio's speech was protected by the First Amendment." *Id.* at 196. The fact that the plaintiff's critical speech was directed to his immediate superiors was not dispositive, in that DeLuzio was complaining about matters of public concern that the "supervisors felt were not within [his] purview"—issues DeLuzio, in light of his status at the agency, was "without power to change[.]" *Id.* District courts within the Circuit have routinely come to similar conclusions as well. *See, e.g. McAndrew v. Bucks Cty. Bd. of Com'rs*, 982 F. Supp. 2d 491, 498, 500 (E.D. Pa. 2013) (noting that "as for internal reporting, speech is not unprotected merely because the employee complains internally through an official 'chain of command[,]'" and finding a deputy sheriff's reporting of fraud and misconduct in his workplace to implicate the First Amendment, because the "reporting of corruption and wrongdoing does not appear to fall within the ambit of the responsibilities of a deputy sheriff"); *Sexton v. Cty. of York, Pa.*, No. 1:12-CV-00402, 2012 WL 2192250, at *4-5 (M.D. Pa. June 14, 2012) (denying a

In 2014, in *Lane v. Franks*, 134 S. Ct. 2369 (2014), the Supreme Court again weighed in on this issue—in a manner that (1) jibed with the Third Circuit's analysis in the cases set out above and (2) further made clear what does (and does not) count as citizen speech. The *Lane* Court clarified that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Lane*, 134 S. Ct. at 2379. Rather, it explained that the "critical question under *Garcetti* is *whether the speech at issue is itself ordinarily within the scope of an employee's duties*, not whether it merely concerns those duties." *Id.* (emphasis added); *see also Flora v. Cty. of Luzerne*, 776 F.3d 169, 178 (3d Cir. 2015); *Dougherty*, 772 F.3d at 988-89.

In this case, to be sure, Plaintiff registered his complaints about alleged copyright violations up the "chain of command"—he complained to the alleged perpetrator, his supervisor, Defendant Corder. (D.I. 33 at ¶¶ 13, 18) But the SAC specifically alleges that Plaintiff's routine job responsibilities did *not* involve communicating such complaints. (*Id.* at ¶¶ 7-10). Indeed, the SAC sets out what Plaintiff's job duties were in some detail, and there is no indication that investigating and reporting on unlawful copyright infringement (or, even more generally, communicating to superiors about textbook selection or acquisition) fell within those duties. (*Id.* at ¶¶ 10, 12 (Plaintiff noting in the Complaint that he had "no involvement with the selection of books and materials" and naming the employee who was responsible for that subject matter))

---

defendant's motion to dismiss, due to the court's disagreement with the defendant's theory that simply because plaintiff's complaints about inappropriate conduct at a county shelter were made "up the chain of command[,]" they must be unprotected speech).

While the issue of whether speech is protected is ultimately a question of law, "whether a particular incident of speech is made within a particular plaintiff's job duties is a mixed question of fact and law." *Foraker*, 501 F.3d at 240.  Here, Plaintiff has alleged (with sufficient factual support) that his speech did not relate to and was not required by his job duties.  The Court must accept all of this as true at the pleading stage.  Therefore, construing the SAC in the light most favorable to the Plaintiff, Plaintiff has sufficiently alleged that he was speaking as a citizen when he made the statements at issue.

### b.    Matter of public concern

The question of whether speech is on a matter of public concern is a question of law.  *See, e.g.*, *Brennan v. Norton*, 350 F.3d 399, 413 (3d Cir. 2003) (citing *Baldassare v. State of N.J.*, 250 F.3d 188, 195 (3d Cir. 2001)).  Speech involves a matter of public concern when it can "be fairly considered as relating to any matter of political, social, or other concern to the community[.]" *Connick v. Myers*, 461 U.S. 138, 146 (1983).  "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147-48.

Here, the content of Plaintiff's speech, as it is described in the SAC, involves a matter of public concern.  Courts have explained that the "content of the speech may involve a matter of public concern if it attempts 'to bring to light actual or potential wrongdoing or breach of public trust on the part of government officials.'" *Baldassare*, 250 F.3d at 195 (quoting *Holder v. City of Allentown*, 987 F.2d 188, 195 (3d Cir. 1993)); *cf. Lane*, 134 S. Ct. at 2380 ("The content of Lane's testimony—corruption in a public program and misuse of state funds—obviously involves a matter of significant public concern.").  This is an accurate characterization of

Plaintiff's speech in the case at hand.  Plaintiff asserts that he spoke out about having uncovered alleged copyright violations "totaling almost a half a million dollars" on the part of a government official, Defendant Corder; he then challenged Defendant Corder to stop the alleged wrongdoing and to rectify it, so that the school district would be legally compliant and would not face financial or criminal ramifications.  (D.I. 33 at ¶¶ 13, 18; *see also* D.I. 13 at 10)[5]

In arguing to the contrary—that Plaintiff's speech does not involve a matter of public concern—Defendants rely heavily on *Mella v. Mapleton Public Schools*, 152 F. App'x 717 (10th Cir. 2005), a decision from the United States Court of Appeals for the Tenth Circuit.  (*See* D.I. 12 at 6-8; D.I. 14 at 3)  In *Mella*, a computer specialist employed by the defendant school district filed suit after the district failed to promote her.  152 F. App'x at 718-20.  She claimed that the decision was in retaliation for her prior actions, wherein she expressed concern to her supervisor about the possible consequences of disabling a security software program (the "Fortres software").  *Id.* at 721.  One of the consequences plaintiff had identified was that if the software was disabled, this could allow teachers to load personal software onto their computers in violation of copyright laws; that, in turn, might cause the school district to incur significant future

---

[5]      Nor do Plaintiff's statements lose their status as those involving a matter of public concern due to the fact that they were communicated internally.  *See Givhan v. Western Line Consol. Sch. Dist.,* 439 U.S. 410, 415-16 (1979) ("Neither the [First] Amendment itself nor our decisions indicate that [the] freedom [of speech] is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public."); *Baldassare*, 250 F.3d at 196-97 (finding that the "internal character" of the plaintiff's conduct was "not necessarily significant, because our inquiry focuses on the nature of the information, not its audience."); *Azzaro v. County of Allegheny*, 110 F.3d 968, 978 (3d Cir. 1997) ("[I]f the content and circumstances of a private communication are such that the message conveyed would be relevant to the process of self-governance if disseminated to the community, that communication is public concern speech even though it occurred in a private context.") (citing *Connick*, 461 U.S. at 148).

liabilities. *Id.* at 719. The Tenth Circuit, however, determined that the speech at issue "did not

touch on a matter of public concern" and that the plaintiff had "merely disagreed with an internal

policy decision about how to limit computer usage[.]" *Id.* at 722.

Defendants here argue that "*Mella* is strikingly similar to the present case." (D.I. 12 at 8)

But this ignores a key reason why the Tenth Circuit reached its result in *Mella*—the speech there

did not relate to disclosure of any actual illegal activity. As the *Mella* Court noted:

> The Fortres software is merely one of several ways to prevent
> teachers from installing inappropriate material on their computers.
> *Its removal is not unlawful. . . . And there is no evidence that*
> *teachers in fact are violating copyright law, previously did, or are*
> *more likely to in the future, without Fortres.* As such, Ms. Mella's
> speech cannot fairly be characterized as an attempt to "disclose []
> . . . evidence of corruption, impropriety, or other malfeasance."

*Mella*, 152 F. App'x at 722 (internal footnote and citation omitted) (emphasis added). In

contrast, Plaintiff here *has* alleged that a school district employee was "in fact . . . violating

copyright law" on a significant scale and that she "previously did" so for many years. (*See, e.g.*,

D.I. 33 at ¶¶ 13-15, 18); *cf. Hulen v. Yates*, 322 F.3d 1229, 1238 (10th Cir. 2003) (listing a

charge of "copyright violations" at a public university as one that "plainly would be of interest to

the public" in assessing whether speech was of public concern).

Furthermore, in *Mella*, the plaintiff "voiced her concerns" not so that evidence of

copyright infringement could be brought to public light, but instead because "'she didn't want to

be held accountable' if problems arose after the removal of Fortres and because she wanted '[t]o

get in writing that [she] was not the one who had ordered it disabled.'" 152 F. App'x at 722; *see*

*also Brennan*, 350 F.3d at 412 (indicating that speech involving solely "'personal grievances'"

cannot amount to a matter of public concern). In the instant case, however, Plaintiff alleges that

he "spoke out because he was concerned about the criminal conduct engaged in by a public school district and the ramifications that conduct would have on the public school district, the community, taxpayers, and all citizens of Delaware who supported the school district." (D.I. 33 at ¶ 19)

For the above reasons, then, Plaintiff has sufficiently alleged that he spoke on a matter of public concern.

### 2.   Whether Plaintiff's Speech Was a Substantial Factor in the Alleged Retaliatory Action

To establish that the protected conduct was a substantial factor in the retaliation, "a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) (citations omitted). Here, the SAC alleges that the Individual Defendants terminated Plaintiff because of his speech, and that they did so only a few weeks after Plaintiff complained of Defendant Corder's allegedly illegal conduct. (D.I. 33 at ¶¶ 13, 22, 42) The allegations regarding temporal proximity of these two events—combined with Plaintiff's allegations that he was given no explanation for his dismissal after 12 years of exemplary work—are sufficient for Plaintiff to survive a motion to dismiss as to this step of the test. *Cf. Beyer v. Borough*, 428 F. App'x 149, 155 (3d Cir. 2011); *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 306 (3d Cir. 2007). Defendants do not argue otherwise.

### 3.   Whether the Adverse Action Would Have Taken Place in the Absence of the Protected Conduct

The inquiry into whether Defendants would have terminated Plaintiff or failed to renew

his contract in the absence of his speech presents questions of fact to be determined by a jury, rather than by the Court at this stage. *See Stiner v. Univ. of Delaware*, 243 F. Supp. 2d 106, 111 (D. Del. 2003) (citing *Green v. Philadelphia Hous. Auth.*, 105 F.3d 882, 889 (3d Cir. 1997)). Again, Defendants do not claim otherwise.

### 4.    Conclusion

For the reason set out above, Plaintiff has adequately alleged First Amendment retaliation claims.

### B.    Municipal and Official Capacity Liability

The Court next addresses Defendants' contention that, even if Plaintiff has sufficiently pleaded the elements of a First Amendment retaliation claim, his allegations against the Board and against the Individual Defendants in their official capacities should nevertheless fail. Defendants argue that this is so because the alleged conduct was not taken pursuant to official municipal custom, policy or practice.

### 1.    Do the SAC's Allegations Make Out Plausible Claims?

The nature of the Court's analysis here is the same with regard to the claims against the Board as it is with regard to the official capacity claims. *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). "A municipality may not be held liable under [Section] 1983 for the constitutional torts of its employees by virtue of *respondeat superior*." *Borough of Kutztown*, 455 F.3d at 245. "When a suit against a municipality is based on [Section] 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally

adopted by custom." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (citing *Monell v. Dep't. of Soc. Servs. of New York*, 436 U.S. 658 (1978)).

In *Borough of Kutztown*, the Third Circuit identified three types of circumstances under which conduct fits this bill:

> (1) the individual acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity, (2) the individual himself has final policy-making authority such that his conduct represents official policy, or (3) a final policy-maker renders the individual's conduct official for liability purposes by having delegated to him authority to act or speak for the government, or by ratifying the conduct or speech after it has occurred.

455 F.3d at 245.  Whether an individual has "'final policymaking authority'" for purposes of this analysis is a question of state law.  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988) (citation omitted).  "[A] federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it." *Id.* at 126; *see also Miller v. Corr. Med. Sys., Inc.*, 802 F. Supp. 1126, 1132 (D. Del. 1992) ("There can be no *de facto* final policymaking authority.").

Under Delaware law, as a general matter, the Board has "the authority to determine policy and adopt rules and regulations for the general administration and supervision" of Sussex Technical School District.  DEL. CODE ANN. tit. 14, § 1043 (*cited in* D.I. 14 at 2).  Additionally, the Board has the power to "[d]etermine the educational policies of the reorganized school district and prescribe rules and regulations for the conduct and management of the schools" and to "[a]ppoint personnel." DEL. CODE ANN. tit. 14, § 1049(a)(2) & (9) (*cited in* D.I. 14 at 2).  School Administrators, such as the Individual Defendants, must:

> [F]aithfully perform those duties which may be assigned by
> the local Board of Education and shall serve the School
> District in a professional manner.  The Administrator shall
> observe and comply with the laws of the State of Delaware
> and with the regulations of the State Department of
> Education and the local Board of Education as currently in
> force and as from time to time amended, enacted or
> promulgated.

14 Del. Admin. Code 725–1.0 (*cited in* D.I. 14 at 2).[6]  Thus, at least with regard to the statutes

and regulations the parties have cited to the Court, state law facially grants policy-making

authority to the Board, and does not explicitly grant decision-making authority with regard to

hiring and firing school personnel to school employees like Defendant Corder or Defendant

Owens.

      But this does not end the necessary inquiry.  It could be, for example, that by custom or

delegation or otherwise, the Board permitted the Individual Defendants the unfettered ability to

make policy regarding the hiring and firing of school employees, including Plaintiff, and/or to

hire and fire such employees.  Or it could be that the Board ratified the Individual Defendants'

firing decision.  And yet it is here where the SAC's confused allegations doom its claims of

municipal/official capacity liability.

      For one thing, the SAC is very unclear as to which of the theories set out above (pursuant

to which an individual's conduct can implement official custom, policy or practice) is said to be

at play here.  Is the allegation that the Individual Defendants acted "pursuant to a formal

government policy or a standard operating procedure" of the Board, or that the Individual

---

[6]     The Court may take into account the content of public statutes or regulations like
those cited in this paragraph, even if not cited in the SAC, in resolving a motion to dismiss.
*Nichols v. Markell*, Civil Action No. 12-777-CJB, 2014 WL 1509780, at *27 n.26 (D. Del. Apr.
17, 2014) (citing cases).

Defendants themselves had "final policy-making authority," or that the Board "delegated to"

them the authority to act or speak for the government, or that the Board "ratif[ied] the [Individual

Defendants] conduct" after it occurred?   At times, the SAC seems to allege one or the other (or

maybe even *all*) of these possibilities.   (*See, e.g.*, D.I. 33 at ¶¶ 4-5 (asserting that Defendant

Corder and Defendant Owens each "acted as a policy maker when [they] terminated [Plaintiff]"

and that Defendant Corder possessed "final decision-making power" as to Plaintiff's

employment); *id.* at ¶ 60 (asserting that "the actions of Defendants were taken pursuant to the

Board['s] policy or custom and were authorized, sanctioned, implemented, permitted, and ratified

by officials functioning at a policy making level"); *id.* at ¶ 61 (alleging that by "the policy,

custom, and/or practice of officials functioning at a policy making level, the Board [] has caused

a deprivation of constitutional rights"))   And yet in his briefing, Plaintiff does not argue all of

these theories are applicable.[7]

Also problematic is that the factual allegations in the SAC—those that are meant to

explain how exactly the actions of the Individual Defendants implicate a policy, practice or

decision attributable to the Board—are difficult to follow and are often contradictory.   For

example:

> (1)  At one point, the SAC alleges that Defendant Corder alone
> "possessed final decision-making power" as to Plaintiff's
> employment.  (D.I. 33 at ¶ 4)  Later it alleges that Defendant Corder
> "recommended to [Defendant] Owens that Plaintiff's contract not
> be renewed[.]"  (*Id.* at ¶ 21)  If Defendant Corder made the final
> decision as to Plaintiff's firing, why did she need to make a

---

[7]     Indeed, in a recent submission, Plaintiff seems to suggest (though again, it is not entirely clear) that he is proceeding solely under the "delegation" theory.  (D.I. 32 at 2 ("The Board of Education delegated to [Defendant Corder and Defendant Owens] the ability to make policy and personnel decisions pursuant to [certain statutory authority].""))

"recommend[ation]" to anybody, including Dr. Owens?

(2)  Despite the above allegations, the SAC goes on to allege that *both* Defendant Corder and Defendant Owens "terminated" Plaintiff and that *both* Individual Defendants "failed to renew" Plaintiff's contract. (*See id.* at ¶¶ 4-5, 22)  It is unclear, however, whether (and how) the Board is said to have delegated to one or both of these Defendants the authority to make certain personnel decisions.

(3)  The SAC goes on to include a number of allegations that leave the impression that Defendant Corder—and Defendant Corder alone—made hiring and firing decisions at the school.  This includes allegations that she had previously made personnel decisions "which she had acted on herself, without Board of Education involvement, such as hiring part time employees[,]" (*id.* at ¶ 26), and that she alone previously fired four school employees, (*id.* at ¶ 27).  How is Defendant Corder alleged to have made hiring and firing decisions "without Board . . . involvement" when Plaintiff's most recent submission suggests that the Board delegated to her (and Defendant Owens) the responsibility to make such decisions?  And why was Defendant Corder acting alone with regard to these prior hiring and firing decisions, but as to the termination of Plaintiff's employment, she is alleged to have acted jointly with Defendant Owens?

As can be seen above, the SAC's allegations are not explicit as to the exact nature of Defendant Corder's and Defendant Owens' roles with regard to Plaintiff's termination.  But, at a minimum, the SAC does repeatedly allege that both Individual Defendants had some role in that decision-making process.  (D.I. 33 at ¶¶ 4-5, 20-24, 46)  In light of this, the Court can conclude that the SAC plausibly alleges that in their individual capacities, Defendant Corder and Defendant Owens each took action in retaliation for Plaintiff's First Amendment-protected speech, which in turn caused Plaintiff injury.

But as to the claims of *municipal/official capacity liability*, the Court concludes that the allegations are so unclear as to be wanting.  The Court does not understand what theory of

municipal/official capacity liability Plaintiff is asserting.  Nor (relatedly) does it understand how, exactly, Plaintiff is claiming the Board interacted with, empowered or otherwise delegated to the Individual Defendants the ability to fire him and teachers like him.[8]  The Court cannot conclude that Plaintiff's allegations of municipal and official capacity liability are *plausible* when it does not understand what they are.  For these reasons, the Court recommends that the Motion be granted as to these claims.

### 2.    Nature of Dismissal

It is a close call as to whether Plaintiff should be permitted one additional opportunity to amend the operative complaint, in order to try to make out claims against the Board and the Individual Defendants in their official capacities.  On the one hand, in this jurisdiction, a court must generally grant a plaintiff leave to amend after finding that the plaintiff's pleading is deficient.  *See, e.g., Shane v. Fauver*, 213 F.3d 113, 116–17 (3d Cir. 2000).  "Dismissal without leave to amend is justified only on the grounds of bad faith, undue delay, prejudice, or futility." *Alston v. Parker*, 363 F.3d 229, 236 (3d Cir. 2004) (citations omitted).  On the other hand, Plaintiff has already amended the Complaint twice—the last time after a case schedule had been entered and discovery was under way.

---

[8]    In their briefs, neither party cited to the chapter of the Delaware Code that appears to relate to the termination of most State public school teachers.  The Code provides that "[a] school employee may be dismissed or suspended from that employee's duties in accordance with Chapter 14 of this title."  DEL. CODE ANN. tit. 14, § 1094(b).  Chapter 14 provides the process for terminating a public school teacher, and refers to "the terminating board."  DEL. CODE ANN. tit. 14, §§ 1402, 1403, 1413.  Pursuant to Subchapter II of Chapter 14, terminating a teacher at the end of the school year involves a notice of intention to terminate services, limitations on the reasons for which a teacher may be terminated, a hearing by the terminating board upon request by the teacher, and the possibility of judicial review of a decision of the board.  DEL. CODE ANN. tit. 14, §§ 1410-14.  It is unclear as to whether Plaintiff's allegations are that these processes were simply ignored in his case, or that they otherwise do not apply to his termination at all.

In the end, though, the Court cannot yet say that amendment would be futile. Some of the above-cited deficiencies as to these claims may simply go to a failure of articulation, not a failure to possess sufficient facts. And although Plaintiff has previously amended his Complaint, he has not yet done so after a Court has adjudged his pleading to be deficient. Under these circumstances, the Court recommends that Plaintiff be given one final opportunity, if he seeks to do so, to set out his claims of municipal and official capacity liability. *Cf. Free Speech Coal., Inc. v. Attorney Gen. of U.S.*, 677 F.3d 519, 545 (3d Cir. 2012); *Knight v. Carmike Cinemas*, Civil Action No. 11-280, 2011 WL 3665379, at *3 (D. Del. Aug. 22, 2011) (stating that "in a civil rights case, a court must allow a plaintiff leave to amend the complaint unless it would be inequitable or futile to do so"); *Hudson v. Aaron Rental Co., Inc.*, C.A. No. 09-332 (GMS), 2010 WL 2679863, at *5 (D. Del. July 6, 2010).

## C.   Qualified Immunity

Defendants also argue that Plaintiff's First Amendment claims against Defendants Corder and Owens in their individual capacities should fail on the basis of qualified immunity. (D.I. 12 at 11-12; D.I. 14 at 4; D.I. 30 at 3-4)

A government official who is personally responsible for an unconstitutional policy will be personally liable unless she can demonstrate that the defense of qualified immunity is applicable. *See, e.g.*, *Melo v. Hafer*, 912 F.2d 628, 637 (3d Cir. 1990). "The doctrine of qualified immunity shields government officials who perform discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "A Government

official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*

Here, Plaintiff clearly alleges that he spoke out to his supervisor as a public citizen—that is, that his complaints did not fall within the ambit of his official employment duties. At least by the time of the Supreme Court's 2014 decision in *Lane*, the caselaw was clear that so long as a public employee's speech (of the kind at issue here) was not offered as part of his ordinary job duties, it qualifies as "citizen speech"—even if (as here) the employee acquired information relating to the speech by virtue of his employment, and spoke up the "chain of command." *See, e.g., Flora*, 776 F.3d at 179 ("Because *Lane* now controls . . . the responsibility of a district court in evaluating whether a public employee's speech was made as a private citizen is to ask whether the speech at issue was 'outside the scope of his ordinary job responsibilities.'") (citation omitted); *cf. Dougherty*, 772 F.3d at 990. Moreover, Plaintiff clearly alleges that his speech involved bringing to light alleged criminal conduct that could have significant financial ramifications for his school and for the school district. That type of speech, pursuant to the relevant caselaw, would have clearly qualified as being of "public concern." And lastly, Plaintiff alleges that in direct retaliation for his speaking out on a matter of public concern, the Individual Defendants (working together in some way) fired him. If all that Plaintiff alleges is true, the Individual Defendants' conduct would be seen as violating a "clearly established" right: the right

25

to be free from retaliation for exercising one's First Amendment rights. For this reason, the Court cannot recommend dismissal of the claim against Defendants Corder and Owens in their individual capacities on the basis of qualified immunity.

### D. Punitive Damages

Municipalities are immune from Section 1983 claims for punitive damages. *Doe v. County of Centre, PA*, 242 F.3d 437, 455 (3d Cir. 2001) (citing *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981)). Similarly, punitive damages cannot be recovered from defendants in their official capacities. *Gregory v. Chehi*, 843 F.2d 111, 120 (3d Cir. 1988). And here, Plaintiff has clarified that he is not seeking punitive damages from the Board or from either Individual Defendant in their official capacities; he is only seeking such damages from Defendant Corder in her individual capacity. (D.I. 13 at 2; D.I. 14 at 1; D.I. 31 at 1; *see also* D.I. 33 at 11 (Plaintiff requesting in the SAC that "defendant Terri Corder" be found liable for "punitive damages"))

Punitive damages may be assessed against a defendant in her individual capacity with regard to a Section 1983 claim if her conduct is "shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983); *Farris v. Moeckel*, 664 F. Supp. 881, 893 (D. Del. 1987).

In this case, Plaintiff does assert in the Complaint that Defendant Corder "either knew or showed a negligent or reckless disregard for . . . whether her conduct violated federal constitutional rights" and that she acted with "evil motive[.]" (D.I. 33 at ¶¶ 50-51) But more importantly, he pleads facts that, if believed, could plausibly support the conclusion that punitive damages are appropriate.

26

Again, Plaintiff's allegations here can fairly be read to indicate that: (1) after Plaintiff complained to Defendant Corder that she was committing illegal copyright infringement (conduct that Defendant Corder had previously claimed was legal, but in fact was not); and (2) after Plaintiff urged Defendant Corder to rectify this conduct; (3) Defendant Corder, instead of taking corrective action, intentionally (along with Defendant Owens) fired Plaintiff because Plaintiff had brought these issues to light. (D.I. 33 at 4-5) This could plausibly amount to the type of "reckless" conduct, or conduct motivated by "callous indifference" to federally protected rights that would justify an aware of punitive damages. *Cf. Springer v. Henry*, 435 F.3d 268, 281-82 (3d Cir. 2006) (affirming an award of punitive damages based on a failure to provide an employee a reasonable opportunity to renew his contract, coupled with "adversarial" interactions) (internal quotation marks and citation omitted). A determination as to whether punitive damages are appropriate will ultimately involve "weighing the testimonial evidence presented and making credibility determinations, which is clearly the province of the factfinder—the jury." *Navarro v. Coons*, C.A. No. 05-565 GMS, 2007 WL 2683824, at *9 (D. Del. Sept. 7, 2007).

Therefore, the Court will recommend denying Defendants' Motion as to Plaintiff's punitive damages claim against Defendant Corder.

## IV.   CONCLUSION

For the foregoing reasons, the Court recommends that the District Court GRANT-IN-PART and DENY-IN-PART the Motion. More specifically, the Court recommends that the District Court DENY the Motion as to Plaintiff's claims against the Individual Defendants in their individual capacities and as to Plaintiff's claim seeking punitive damages against Defendant Corder. The Court recommends that the District Court GRANT the Motion as to Plaintiff's

27

claims against the Board and the Individual Defendants in their official capacities, but recommends that the dismissal be without prejudice to Plaintiff being granted one final opportunity to amend those claims.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated: October 12, 2016

_____
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE